

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-25-2004

# In Re: Diet Drugs

Precedential or Non-Precedential: Precedential

Docket No. 02-4582

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"In Re: Diet Drugs " (2004). *2004 Decisions.* Paper 645.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/645

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES
COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 02-4582, 03-2033,
03-2936, and 03-4362

———————

IN RE: DIET DRUGS
(PHENTERMINE/
FENFLURAMINE/
DEXFENFLURAMINE)
PRODUCTS LIABILITY LITIGATION

Linda Smart, a class member who
has exercised her intermediate opt-
out rights

Appellant (02-4582)

———————

IN RE: DIET DRUGS
(PHENTERMINE/
FENFLURAMINE/
DEXFENFLURAMINE)
PRODUCTS LIABILITY LITIGATION

Clara Clark, Linda Smart, George
M. Fleming, Fleming & Associates,
L.L.P., Mike O'Brien and Michael
C. Abbott,

Appellants (03-2033)

———————

IN RE: DIET DRUGS
(PHENTERMINE/

FENFLURAMINE/
DEXFENFLURAMINE)
PRODUCTS LIABILITY LITIGATION

Keith K. Barlow, Ruby S. Barlow,
Cherry Barnes, Joe Wayne Burton,
Nora K. Burton, Lonelle S. James,
Michael J. Miller, Kenneth W.
Smith, Miller & Associates,
Edward A. Williamson, Fenton B.
DeWeese, II, The Law Office of
Edward A. Williamson, Merrida
Coxwell, Charles R. Mullins,
Coxwell & Associates, PLLC, and
Eugene C. Tullos,

Appellants (03-2936)

———————

IN RE: DIET DRUGS
(PHENTERMINE/
FENFLURAMINE/
DEXFENFLURAMINE)
PRODUCTS LIABILITY LITIGATION

Linda Eichmiller, Brenda Cook,
Richard Cook, Doris Caldwell,
Susan McCarty, Jim McCarty, Jr.,
Julia Campbell, Carolyn Winters,
Bobby G. Winters, Macy Houston,
and John F. Houston, III,

Appellants (03-4362)

———————

On Appeal from the
United States District Court for the
Eastern District of Pennsylvania
(MDL No. 1203)
District Judge: Honorable

Harvey Bartle, III

————————

Argued: December 10, 2003

Before: AMBRO, FUENTES and CHERTOFF, Circuit Judges

(Opinion filed May 25, 2004)

John G. Harkins, Jr. (Argued)
Steven A. Reed
Harkins Cunningham
2800 One Commerce Square
2005 Market Street
Philadelphia, PA 19103-7042

*Attorneys for Appellant*
*Linda Smart*

George M. Fleming, Esq.
Sylvia Davidow, Esq.
Rand P. Nolen
Scott A. Love
Fleming & Associates, L.L.P.
1330 Post Oak Boulevard, Suite 3030
Houston, TX 77056

Mike O'Brien, Esq.
Mike O'Brien, P.C.
1330 Post Oak Boulevard, Suite 2960
Houston, TX 77056

*Attorneys for Appellants*
*Linda Smart, Clara Clark, et al.,*
*and Linda Eichmiller, et al.*

Michael J. Miller, Esq.
Christopher A. Gomez, Esq.
Michelle DeMartino, Esq.
Kenneth W. Smith, Esq.
Michael J. Miller & Associates
809 Cameron Street
Alexandria, VA 22314

*Attorneys for Appellants*
*Keith Barlow, et al.*

Fred S. Longer, Esq.
Arnold Levin, Esq.
Michael D. Fishbein, Esq.
Levin, Fishbein, Sedran & Berman
510 Walnut Street
Suite 500
Philadelphia, PA 19106

*Attorneys for Appellees*
*Plaintiff Class and Class Counsel*

Robert D. Rosenbaum, Esq.
Arnold & Porter
555 12th Street, N. W.
Washington, D.C. 20004

Peter L. Zimroth, Esq. (Argued)
Arnold & Porter
399 Park Avenue
New York, NY 10022-4690

*Attorneys for Appellee*
*American Home Products Corporation*

Robert S. Conrad
National Chamber Litigation Center, Inc.
1615 H Street, N.W.
Washington, D.C. 20062

Miriam Nemetz
Carl J. Summers
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, D.C. 20006

*Attorneys for Amicus*
*The Chamber of Commerce*
*of the United States*

Ellen A. Presby
Steve Baughman Jensen
S. Ann Saucer
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219

*Attorneys for Amicus*
*Class Members Represented by*
*Baron & Budd, P.C.*

W. Lewis Garrison
Ursula Tracy Doyle
Garrison Scott Gamble & Rosenthal, P.C.
P.O. Box 11310
Birmingham, AL 35202

*Attorneys for Amicus*
*Opt-Out Plaintiffs' Counsel*

Leslie A. Brueckner
Michael J. Quirk
Trial Lawyers for Public Justice, P.C.
1717 Massachusetts Avenue, N.W., Suite 800
Washington, D.C. 20036

*Attorneys for Amicus*
*Trial Lawyers for Public Justice*

Denise A. Rubin
Napoli, Kaiser, Bern & Associates
3500 Sunrise Highway
Suite T-207
Great River, NY 11739

James H. Pearson
M. Bain Pearson
Pearson & Pearson, L.L.P.
M. Bain Pearson
1330 Post Oak Blvd., Suite 2900
Houston, TX 770456

*Attorneys for Amicus*
*Opt-Out Plaintiffs' Counsel*

---

OPINION

---

Chertoff, <u>Circuit Judge</u>.

This appeal arises out of the settlement of a complex multidistrict federal mass tort class action. As part of the complicated settlement agreement, class members were entitled to opt out at various stages. Those who chose to opt out initially were freed to pursue their remedies elsewhere. Those who did not opt out at the beginning were afforded opportunities to opt out "downstream" at an intermediate stage or at the "back-end." But those downstream opt-out rights were not absolute. Rather, members who elected to delay an opt-out beyond the initial stage were informed that they would

not have unfettered ability to litigate all claims elsewhere. Instead, among other things, these so-called intermediate and back-end class "opt-outs" were precluded under the settlement agreement from pursuing punitive, exemplary, or multiple damages.

The questions presented here arise from the District Court's efforts to enforce the terms of the settlement against intermediate opt-out class members now litigating their claims in various state courts. What appellee class counsel and appellee defendant fear is that counsel for intermediate opt-outs will undermine the efficacy of the settlement by evading or circumventing the punitive damages restrictions to which they are bound under the agreement. Appellants, who are individual intermediate opt-outs now pressing claims in state court, complain that the District Court has gone beyond enforcing the plain restrictions of the settlement and has taken steps that will hamper or defeat plaintiffs' ability to pursue claims that are not barred by the settlement.

In one sense, the issues framed in the appeal reflect efforts by creative counsel on both sides to interpret and apply settlement terms so as to gain advantage in the individual lawsuits brought by intermediate opt-outs in various state courts. But larger institutional and fairness issues are at stake.

The nationwide class settlement is a device that holds the promise of resolving millions of claims in a way that affords deserving claimants some measure of relief while preserving a defendant business as a viable entity that can actually pay compensation. See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 784 (3d Cir. 1995). All claimants benefit from such an outcome, because each has a fair opportunity at recovery. Later claimants need not fear that the fund will be exhausted before their turn comes, or that the defendant will undertake a scorched earth defense that consumes assets otherwise available for compensation, or simply turn off the spigot by filing for bankruptcy. The defendant, too, obviously benefits from a limit to liability that ensures corporate survival. For this type of global settlement to work, however, the district court must successfully discharge the herculean task of enforcing the terms of the class settlement agreement against the constant pressure of some settlement class members who, having obtained part of a loaf through the agreement, now pursue alternative avenues to obtain additional slices. Otherwise, individual class members' activities "would be disruptive to the district court's ongoing settlement management and would jeopardize the settlement's fruition." Carlough v. Amchem Prods., Inc., 10 F.3d 189, 204 (3d Cir. 1993).

As appealing as the efficiencies of a nationwide mass tort class settlement may be, however, the Supreme Court has repeatedly cautioned that they cannot override fundamental principles of due

process or faithful application of controlling law. See Ortiz v. Fibreboard Corp., 527 U.S. 815, 845-48 (1999); Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997); Phillips Petroleum Corp. v. Shutts, 472 U.S. 797, 812 (1985). Because a class settlement disposes of the rights of many people who are absent from the proceeding and only virtually represented by class counsel, due process considerations such as adequacy of notice and adequacy of representation have special force. Ortiz, 527 U.S. at 847-48. As we observed in our opinion in Georgine v. Amchem Prods., Inc.—in a passage endorsed by the Supreme Court, see 521 U.S. at 628—inadequacies in the quality of notice raise "serious fairness concerns." 83 F.3d 610, 634 (3d Cir. 1996).

Moreover, when a federal court seeks to effectuate a settlement agreement by way of enjoining state court proceedings, additional constraints qualify its authority. We have held that district courts have the authority under the All Writs Act, 28 U.S.C. § 1651, to protect their jurisdiction by enjoining state court proceedings that interfere with a judicially approved settlement. See In re Prudential Ins. Co. Sales Practices Litig., 314 F.3d 99, 103-05 (3d Cir. 2002) (hereinafter Prudential II); In re Diet Drugs Prods. Liab. Litig., 282 F.3d 220, 233-39 (3d Cir. 2002) (hereinafter Diet Drugs I). But the Anti-Injunction Act, 28 U.S.C. § 2283, and federalism concerns circumscribe this power and require that it be "construed narrowly" and invoked sparingly. Diet Drugs I, 282 F.3d at 233-34. The power of

federal courts to intrude into the domain of state courts administrating their own laws implicates a host of sensitive concerns and is therefore limited. See, e.g., Rizzo v. Goode, 423 U.S. 362, 379-80 (1976); Huffman v. Pursue, Ltd., 420 U.S. 592, 600-01 (1975).

In addition, as with any injunction, traditional principles of equity apply. The terms of any injunction, for example, must be commensurate with the violation the court seeks to remedy. And practical considerations such as manageability and enforceability militate against an order that enmeshes a district court in protracted micromanagement of litigation in a state court. These principles of equity counseling restraint take on particular significance when issues of federalism are involved. When federal courts are confronted with requests for relief that require interference with state civil functions, "they should abide by standards of restraint that go well beyond those of private equity jurisprudence." Huffman, 420 U.S. at 603.

All of these concerns come to bear on our resolution of the appeal from the District Court's orders in this case. For the reasons stated in this opinion, we agree that the District Court had power under the All Writs Act to supervise and curtail the actions of intermediate opt-out class members in pursuing their individual claims. But we believe that the injunctions imposed some restrictions not fairly comprehended within the terms of the settlement agreement and class notice and, in certain ways, transgressed the limits of

federalism and prudence that confine the exercise of federal judicial authority.

Emphatically, the District Court is empowered to protect its jurisdiction and effectuate the settlement agreement. In this case, however, elements of the protective orders in question must be refashioned to be consistent with fair class notice, to respect appropriate boundaries in relation to state courts, and to accord with traditional principles of equity jurisprudence.

## I.

## A.

The history of this litigation was previously detailed in our opinion in Diet Drugs I, 282 F.3d at 225-29. The cases marshaled before the District Court arose from the marketing of two appetite suppressants, fenfluramine (sold as "Pondimin") and dexfenfluramine (sold as "Redux"). Appellee American Home Products[1] removed the drugs from the market in September of 1997, after data came to light suggesting a link between use of the drugs and valvular heart damage ("VHD") and after the United States Food and Drug Administration ("FDA") issued a public health advisory alert. By that time, four million people had taken Pondimin over the previous two years, and two million people had taken Redux.

Following the FDA's issuance of the public health warning and Wyeth's withdrawal of the diet drugs from the market, approximately eighteen thousand individual lawsuits and over one hundred putative class actions were filed in federal and state courts around the country. Most plaintiffs alleged that the drugs caused them to suffer from VHD. A small fraction claimed the drugs caused them to suffer from primary pulmonary hypertension ("PPH," a rare and often fatal lung disease), neurotoxic injuries, or other assorted injuries. In December of 1997, the Judicial Panel for Multidistrict Litigation transferred all the federal actions to Judge Louis Bechtle in the United States District Court for the Eastern District of Pennsylvania, creating Multidistrict Litigation 1203 ("MDL 1203").[2]

In April of 1999, Wyeth began "global" settlement talks with plaintiffs in the federal action together with several plaintiffs in similar state class actions. The parties reached a tentative settlement agreement for a nationwide class in November of 1999. Soon thereafter, on November 23, 1999, the District Court conditionally certified a nationwide settlement class and, concurrently, preliminarily approved the settlement.

The Court scheduled a fairness hearing for May 1, 2000 on class

---

[1] American Home Products changed its name to Wyeth in March of 2002. We use the name Wyeth for the remainder of the opinion.

[2] Judge Bechtle has since retired, and Judge Harvey Bartle, III, now presides over MDL 1203.

certification and final settlement approval. On August 28, 2000, the District Court entered a final order certifying the class and approving the settlement.

## B.

The settlement agreement embraces all persons who took Pondimin or Redux. Wyeth undertook to pay up to $3.75 billion (present value) to fund benefits to members of the class. Settling class members agreed in return to release Wyeth from all claims arising out of their ingestion of the drugs, other than claims based on PPH brought by individuals who met certain medical criteria.

The agreement was crafted to avoid an all-or-nothing choice at the threshold. Rather, several opt-out points were envisioned at various places along the continuum of the settlement period. Putative class members who wished to opt out entirely from the settlement, foregoing all benefits and any restrictions, were obliged to file their opt-out notices by March 30, 2000. Drug users who chose not to opt out initially became settlement class members, bound not to assert "settled claims" against Wyeth except as the agreement permits.[3]

The agreement allows class members who are medically and otherwise eligible opportunities to opt out at a later time, at an intermediate stage.[4] Those who choose to opt out at an intermediate stage receive no compensation but are permitted to pursue most of their "settled claims" individually, subject to certain restrictions. The settlement agreement provides, in relevant part:

> [Intermediate opt-outs] may not seek punitive, exemplary, or any multiple damages against [Wyeth and other released parties]; . . . . [Intermediate opt-outs] may not use any previous verdicts or judgments against [Wyeth], or factual findings necessary to such verdicts or judgments, for purposes of establishing claims or facts in order to obtain a verdict or judgment . . . . Nor may [an intermediate opt-out] . . . seek to introduce into evidence against [Wyeth], for any purpose, such a verdict, judgment or factual finding.

Joint App. 616-17.

In return for intermediate opt-outs'

---

[3] "Settled claims" generally included all conceivable claims arising out of purchase and use of the diet drugs but specifically excluded, among other things, claims based on PPH.

[4] Some class members who did not exercise an intermediate opt-out reserved a so-called "back-end" opt-out right. Back-end opt-out rights are not at issue in this appeal.

acceptance of the limitation on punitive and multiple damages, Wyeth agreed not to assert any statute of limitations, laches, or claims-splitting defenses against allowed individual claims.

In approving the settlement, the District Court expressly relied in part on the finding that "class members had an opportunity to preserve their punitive damages claims by exercising the initial opt out." In re Diet Drugs Prods. Liab. Litig., No. 99-20593, 2000 WL 1222042, at *49 n.22 (E.D. Pa. Aug. 28, 2000) ("Memorandum and Pretrial Order No. 1415," hereinafter "PTO 1415"). The District Court also observed that the waiver of punitive damages was not an inappropriate "trade-off," since "punitive damage claims are often illusory" and subject to judicial limitation or reduction as a matter of fairness to the defendant. Id. In addition, the District Court expressly retained jurisdiction to "enforce the Settlement in accordance with its terms; . . . and to enter such other and further orders as are needed to effectuate the terms of the Settlement." Id. at *72.

This Court affirmed PTO 1415 without opinion. In re Diet Drugs Prods. Liab. Litig., 275 F.3d 34 (3d Cir. 2001).

C.

A number of class members who did not exercise their initial opt-out rights elected to opt out at the intermediate stage. Plaintiffs Clara Clark and Linda Smart, both represented by the Texas law firm of Fleming & Associates, filed lawsuits in Texas state court. Clark sued Wyeth and her physician in 2002, alleging claims of negligence, products liability, improper warnings, and fraud. Clark's final amended petition seeks recovery of compensatory damages, including damages for pain, disfigurement, mental anguish, and medical expenses. Likewise, Smart's petition alleges claims against Wyeth and her physician for actual damages for pain, disfigurement, anguish, and medical expenses arising from state tort claims of negligence, failure to warn, and design defect.

Meanwhile, in state court in Mississippi, class member Lonelle James, and others, also filed claims against Wyeth after exercising their intermediate opt-out rights. James was selected as the first trial plaintiff. Her claims were based on state law theories of negligence, strict liability for design and marketing defect, inadequate and improper warnings, misrepresentation, and breach of implied warranty. James sought compensatory damages—including damages for pain and mental anguish, lost earnings, disfigurement, physical impairment, medical expenses, and loss of enjoyment of life—from both Wyeth and her physician.

Plaintiffs' state court claims were pleaded in terms that appeared to abide by the terms of the settlement preclusion of punitive and multiple damages. But the actual conduct of the litigation raised justifiable fear in the District Court, and among the counsel for defendant and the class, that the plaintiffs were seeking to obtain through the back door what they

were barred from receiving through the front. Reviewing the state court submissions by Clark's counsel, the District Court found—and this is undisputed— that Clark's case summary was "replete with statements leading ineluctably to the conclusion that such punitive damages are being sought, even though not by that name." In re Diet Drugs Prods. Liab. Litig., No. 99-20593, Memorandum and Pretrial Order No. 2625, at 2 (E.D. Pa. filed October 16, 2002) (hereinafter "PTO 2625"). Clark's case summary expressed the intent to offer evidence concerning "'tens of thousands of people [who] were injured'"; Wyeth's guilt of "'corporate avarice'"; and its alleged "'goal of increasing profits at the expense of human life.'" Id. at 2-3. Worse yet, another submission (in a perhaps Freudian slip) averred that, among other things, "'[p]laintiff seeks punitive damages.'" Id. at 4. Before the District Court, Clark's counsel disavowed that claim as an error. The District Court concluded, however, that Clark's counsel was seeking to "circumvent" the punitive damages bar and enjoined him from:

> introducing any evidence or making any statement before or argument to the court or jury related directly or indirectly to (a) punitive, exemplary or multiple damages, however described; and (b) malicious, wanton or other similar conduct of Wyeth, however described; . . . [or]

any medical condition of plaintiff caused by Wyeth other than mitral valve regurgitation [VHD] or pulmonary hypertension secondary to mitral valve regurgitation.

Id. at ¶¶ 2-3.

Soon thereafter counsel Fleming's other client, Linda Smart, found her state court case brought to the attention of the District Court. The District Court noted that Fleming was obviously aware of the ruling in the Clark litigation, but nevertheless had submitted a proposed jury charge containing inflammatory language and references to destruction of evidence and a cover up. The District Court rejected the contention that this evidence was admissible on issues properly before the state trial court and concluded that

> to allow a class member to introduce into evidence or to argue the elements of a punitive damage claim on the condition that he or she does not specifically request punitive damages by name. . . . would create a giant loophole.

In re Diet Drugs Prods. Liab. Litig., No. 99-20953, Memorandum and Pretrial Order No. 2680, at 7 (E.D. Pa. filed December 11, 2002) (hereinafter "PTO 2680"). Consequently, the Court issued an injunction similar to that in the Clark case.

Only a few weeks later, Wyeth

9

returned to District Court once again to address Clark. Reviewing Clark's amended trial exhibit list, the District Court observed that it demonstrated "counsel's motive to infect the trial with improper bad conduct evidence concerning Wyeth." In re Diet Drugs Prods. Liab. Litig., No. 99-20593, Memorandum and Pretrial Order No. 2717 at 3 (E.D. Pa. filed January 29, 2003) (hereinafter "PTO 2717"). At the same time—and significantly—the District Court quoted the state trial judge, who expressed his commitment to assure "'a fair verdict that is an approximation of the damages and not a result of them [the jury] being incensed.'" Id. at 4. The District Court concluded that counsel Fleming had merely withdrawn certain submissions and substituted others in an effort to circumvent the prior injunctions.

The District Court held Fleming in civil contempt and issued an order, PTO 2717, enjoining Clark and her counsel from commencing the state trial until Fleming submitted, and the Court approved, a statement under oath that he would obey PTO 2625. The order provided:

> That statement must declare that with respect to Wyeth's conduct he will not inject into the case any evidence, statement, or argument, directly or indirectly, that connotes more than simple negligence or defective design without fault. The statement must also declare

that he will not introduce at the trial any reference to Wyeth's size, financial condition, or worth. He must also include as part of his statement his trial exhibits, witness list, and points for charge . . . .

Id. at ¶ 2.

Back in Texas, the trial judge in the Clark case held an extensive pretrial conference. On February 5, 2003, State District Judge Dennis Powell issued an extensive thirteen-page pretrial order. Judge Powell's carefully reasoned and written opinion exhibited understanding of the effect of the settlement preclusion and a determination to honor it. The State District Judge perceptively observed that "not surprisingly, the plaintiff wants to try the case in a manner that will maximize the chances of a significant recovery, and, not surprisingly, the defendant wants to try the case in a manner that will minimize the chances of a significant recovery." Joint App. 1281. Accordingly, the state court flatly prohibited evidence relevant only to punitive or exemplary damages and evidence relevant to other issues but unduly prejudicial or misleading. At the same time, Judge Powell said he would

> not require the plaintiff to "try the case in a vacuum of the defendant's design," which could result in the jury improperly speculating about liability issues and evidence (or the lack

10

thereof) and factoring such speculations into causation issues or damage evaluations.

Id. at 1282.

A good deal of the state pretrial order is devoted to analyzing Wyeth's purported willingness to stipulate or concede certain issues so as to remove them from the case. This offer—which was brandished by Wyeth before the federal District Court during the Fleming contempt proceeding that led to PTO 2717—presumably would have eliminated any proper incentive for Clark to offer inflammatory evidence as part of a negligence or design case. But the State District Judge, armed with his understandably greater familiarity with Texas tort law, found Wyeth's apparent concessions to be less than they appeared. As he pointed out, the proposed concessions, which would supposedly leave only causation and damages in the case, would actually do no such thing. In the words of Judge Powell:

> Likewise the defendant created the impression before [U.S. District] Judge Bartle that "they [Wyeth] also admitted that the injury was foreseeable," and that "the injury is foreseeable from the defectively designed product." Nonetheless, contrary to the representations to both courts, the [proposed

concession] contains no finding that the injury was foreseeable by the defendant, or that the injury was foreseeable from the defectively designed product. The law requires proof, the plaintiff pleaded it, the defendant refused to admit it was conceded, but then the defendant does not want the plaintiff to put on evidence on that element.

Id. at 1288-89.

The state trial court noted an additional problem: the proposed concessions would place the court in a dilemma. If certain issues were taken from the case with no actual admission by Wyeth, it would require the court to instruct the jury that defendant would be automatically liable if the plaintiff's injury were caused by Wyeth's drug, without regard to fault. But this is a matter that could affect jury voir dire, Judge Powell explained, and might require striking potential jurors who could not return a verdict on damages without "considering whether absolute liability law was fair or not." Id. at 1290.

For these reasons, Judge Powell declined to accept Wyeth's concessions in their tendered form, although he remained open to a stipulation of outright admission on one or more of the elements of any cause of action. "No doubt some evidence that would be relevant to liability would also be relevant to causation, but this

11

submission would greatly simplify the evidence . . . ." Id. at 1291.

Evidently, the parties found this invitation unappealing, and the action moved again to federal court in Philadelphia. In March of 2003, the District Court conducted a lengthy conference and reviewed and ruled on voluminous deposition excerpts and proposed trial exhibits to determine whether the settlement agreement barred Clark from offering them into evidence at trial. The District Court entered an order that enforces a series of prophylactic prohibitions against introducing evidence deemed relevant only to punitive damages or unfairly prejudicial when balanced against probative value.

First, the order forbids plaintiffs from offering into evidence a list of specific exhibits and deposition testimony. And, except as specifically allowed by the accompanying memorandum, it prohibits counsel from "making any statement or argument to the court or jury related directly or indirectly" to the forbidden evidence. The District Court ruled, for example, that Clark (1) could attack the credibility of certain medical review articles by proving they were funded by Wyeth, but not by showing that they were actually ghostwritten at the behest of Wyeth; (2) could not offer any evidence of concealment of information or destruction of documents; (3) must redact portions of documents suggesting problems with Wyeth's diligence in reporting serious side-effects of the drugs to the FDA; and (4) must redact an internal Wyeth

memorandum to eliminate the phrase "the public is increasingly concerned and afraid of the drug." In re Diet Drugs Prods. Liab. Litig., No. 20593, Memorandum and Pretrial Order No. 2828 (E.D. Pa. filed April 8, 2003) (hereinafter "PTO 2828").

Second, the order bars Clark and her attorneys from "introducing any evidence, making any statement before or argument to the court or jury, related directly or indirectly to":

> [1] punitive, exemplary or multiple damages, however described;
>
> [2] malicious, wanton or *other similar conduct* of Wyeth, however described;
> . . .
>
> [3] any medical condition of plaintiff caused by Wyeth other than left-sided mitral valve regurgitation or pulmonary hypertension secondary to mitral valve regurgitation;
>
> . . . .
>
> [4] Wyeth's profits, size or financial condition;
>
> [5] the amount or size of Wyeth's sales of diet drugs or other products;
>
> [6] Wyeth's marketing or promotion of diet drugs to the extent that Wyeth placed marketing or promotion ahead of health or safety

12

concerns;

[7] any deception or any destruction, hiding, overwriting, or deliberate miscoding of documents or information by Wyeth;

[8] any involvement by Wyeth in the ghostwriting of articles;

[9] primary pulmonary hypertension;

[10] neurotoxicity; and

[11] any other disease, illness or condition or persons suffering from any other disease, illness or condition caused by Redux or Pondimin except for left-sided valvular heart disease or pulmonary hypertension secondary to left-sided valvular heart disease.

Id. at 1-3 (emphasis added). So, for example, the District Court allowed Clark to prove that relevant warnings were inadequate or wrong but said Clark "may not prove or argue that any such failure was deliberate or intentional." Id. at 9.

The District Court vacated its previous orders, PTO 2625 and PTO 2717, in light of the more recent and comprehensive PTO 2828. And, on June 10, 2003, the District Court issued Pretrial Order 2883 ("PTO 2883"), which essentially incorporated the restrictions of PTO 2828 and enforced them against plaintiff James in her case in Mississippi state court. Appellants timely appealed PTO 2680 (Smart), PTO 2828 (Clark), and PTO 2883 (James).

In October of 2003, while those appeals were pending, Wyeth returned to federal court seeking an injunction against other intermediate opt-outs—including Linda Eichmiller, also represented by Fleming & Associates—pursuing claims in Georgia and Mississippi state courts. Wyeth argued that counsel from Fleming & Associates were seeking to introduce evidence in violation of PTO 2828 even though they had agreed to comply with PTO 2828 in other cases pending our review of the order on appeal.

Wyeth asserted that counsel sought to introduce evidence regarding PPH—specifically, a label for Pondimin noting that some users had suffered from PPH and a "black box warning" regarding PPH that the FDA was considering in connection with the approval of Redux—even though plaintiffs were only claiming they suffered from VHD. The District Court entered an injunction similar to PTO 2828, Pretrial Order 3088 ("PTO 3088"), and explicitly barred plaintiffs from seeking to introduce the PPH evidence at trial.

Plaintiffs timely appealed PTO 3088, and it was consolidated by orders of this Court with the other appeals from the District Court's earlier similar orders. We have jurisdiction under 28 U.S.C. § 1292(a)(1).

II.

13

A distasteful picture of the state court litigation emerges, displaying what some might consider the excesses of our adversary justice system. Each side sought to manipulate the settlement agreement in order to optimize its advantage. Wyeth's counsel resisted admitting, and sought to exclude, evidence that tended to support any liability by Wyeth. Plaintiffs' counsel, notably Fleming, repeatedly skirted the settlement and the District Court's orders, plainly seeking to inject prejudicial matter into the state court cases, including information about Wyeth's profits and sales that was clearly irrelevant to negligence liability, causation, or compensatory damages, and that could only be relevant to obtaining punitive damages.

The District Court properly observed that, were plaintiffs' counsel permitted to flout the limits of the settlement, the

> floodgates will be open and the prohibition against punitive damages in the court approved Settlement Agreement will be nothing but a dead letter, with potentially dire consequences for the settlement as a whole.

PTO 2717. Faced with this prospect, the District Court entered the injunctions at issue in this appeal in order to protect the settlement against guerrilla warfare from the opt-out lawyers.

Appellants now urge us to vacate the District Court's orders for three primary reasons. First, they argue that the orders run afoul of the Anti-Injunction Act and All Writs Act. Second, they contend that the <u>Younger</u> abstention doctrine required the District Court to refrain from enjoining the state court proceedings. Finally, appellants argue that the orders contravene the terms of the settlement agreement, are unmanageable, and run afoul of principles of federalism and comity.

"The standard of review for the authority to issue an injunction under the Anti-Injunction Act and the All-Writs Act is de novo." <u>In re Prudential Ins. Co. of Am. Sales Practices Litig.</u>, 261 F.3d 355, 363 (3d Cir. 2001) (internal citations omitted) (hereinafter <u>Prudential I</u>). When reviewing a district court's decision whether to abstain, "the underlying legal questions are subject to plenary review, but the decision to abstain is reviewed for an abuse of discretion." <u>Grode v. Mut. Fire, Marine & Inland Ins. Co.</u>, 8 F.3d 953, 957 (3d Cir. 1993). "We review the terms of an injunction for an abuse of discretion, underlying questions of law receive de novo review, and factual determinations are reviewed for clear error." <u>Prudential I</u>, 261 F.3d at 363. Finally, we apply plenary review to a district court's construction of a settlement agreement, but we review a district court's interpretation of a settlement agreement for clear error. <u>Coltec Indus., Inc. v. Hobgood</u>, 280 F.3d 262, 269 (3d Cir. 2002) (citing <u>In re Cendant Corp. Prides Litig.</u>, 233 F.3d 188,

14

193 (3d Cir. 2000)).[5]

### A.

The All Writs Act empowers district courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. The authority the All Writs Act imparts to district courts is limited, however, by the Anti-Injunction Act, which prohibits injunctions "to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.

The two statutes act in concert, and "[i]f an injunction falls within one of [the Anti-Injunction Act's] three exceptions, the All-Writs Act provides the positive authority for federal courts to issue injunctions of state court proceedings." In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 134 F.3d 133, 143 (3d Cir. 1998); see also Carlough, 10 F.3d at 201 n.9. The pretrial injunctions at issue here were not expressly authorized by statute, so they may be justified only under the Anti-Injunction Act's "in aid of its jurisdiction" or "protect or effectuate its judgments" exceptions. These exceptions "are narrow and are 'not [to] be enlarged

by loose statutory construction.'" Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 146 (1988) (quoting Atl. Coast Line R.R. v. Bhd. Of Locomotive Eng'rs, 398 U.S. 281, 287 (1970)).

The "protect or effectuate its judgments" exception, known as the "relitigation exception," is "founded in the well-recognized concepts of *res judicata* and collateral estoppel." Id. at 147. "The relitigation exception was designed to permit a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court." Id.

We approved an injunction against state court proceedings under the relitigation exception in Prudential I. That case arose from the class settlement of claims brought by Prudential policyholders arising from allegedly fraudulent sales practices. Class members were free to choose settlement for some policies and not for others. The notice of settlement specifically advised each potential class member, however, that acceptance of the settlement would prevent any future assertion of claims that had been or could have been asserted with respect to any policy for which the class member chose to settle.

Two class members accepted the settlement for several policies but opted out for two others. They then brought a Florida state action to recover on the two excluded policies, basing their claims in part on facts that also supported claims arising from settled policies. In effect,

---

[5] We discussed at length the distinction between contract construction and contract interpretation in Ram Constr. Co. v. Am. States Ins. Co., 749 F.2d 1049, 1053 (3d Cir. 1984).

15

plaintiffs sought to undermine the settlement's claim preclusion order.

The District Court enjoined the plaintiffs in the Florida action from "using evidence common to the purchase and sale" of the settled policies. 261 F.3d at 368. The injunction effectuated the settlement agreement's bar against new claims based on "facts and circumstances underlying" the claims that had been settled and released. Id. at 361. The order was designed to prevent new claims that were based in whole or part on settled and released claims. The straightforward injunction language mirrored the familiar rules of claim and issue preclusion that are often applied by courts.

This case differs from Prudential I, because under the settlement agreement opt-outs' settled claims do not go to judgment; rather, their claims proceed in state courts with limits on the type of damages they can seek. Thus the District Court had to enforce a damages preclusion, not a claim preclusion. This was obviously more complicated because permitted claims could give rise to both allowable compensatory damages and forbidden punitive damages.

Consequently, the concepts of issue and claim preclusion are not entirely apposite here. We need not determine whether the District Court had the authority to effectuate the settlement agreement's punitive damages provision under the Anti-Injunction Act's relitigation exception, however, because in any case it had the power to issue the injunction under the "in aid of jurisdiction" exception.

"[A]n injunction is necessary in aid of a court's jurisdiction only if 'some federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case.'" Diet Drugs I, 282 F.3d at 234 (quoting Atl. Coast Line R.R., 398 U.S. at 294). One instance where we have determined that a federal court may enjoin state court proceedings to protect its jurisdiction is when a federal court is "entertaining complex litigation, especially when it involves a substantial class of persons from multiple states, or represents a consolidation of cases from multiple districts." Id. at 235 (citing Carlough, 10 F.3d at 202-04); see also In re Gen. Motors, 134 F.3d at 145.

Here, as in Prudential II, the District Court retained "continuing and exclusive jurisdiction . . . to administer, supervise, interpret and enforce the Settlement in accordance with its terms." Joint App. 398. In Prudential II, we explained:

> The settlement here represented a herculean effort to provide a fair and consistent framework for the resolution of millions of claims. The comprehensive procedures implemented for this purpose were integral to this effort. Permitting continued litigation of these

16

claims would "unsettle" what had been thought to be settled, and would disrupt carefully constructed procedures for individual dispute resolution. Allowing comprehensive settlements to be undermined in this way would undeniably deter similar settlements in the future.

314 F.3d at 105; see also United States v. Alpine Land & Reservoir Co., 174 F.3d 1007, 1015 (9th Cir. 1999) (finding that the "in aid of its jurisdiction" exception applies when district court retains jurisdiction over a settlement agreement).

As we have described above, the punitive damages release is a central pillar of the settlement agreement. Allowing state court actions to run afoul of that provision would fatally subvert it and render the agreement (and the Court's jurisdiction) nugatory. The District Court's ability to give effect to that provision is necessary in aid of its jurisdiction.

Yet "the fact that an injunction *may* issue under the Anti-Injunction Act does not mean that it *must* issue." Chick Kam Choo, 486 U.S. at 151. Specifically, principles of comity, federalism, and equity always restrain federal courts' ability to enjoin state court proceedings. See Mitchum v. Foster, 407 U.S. 225, 243 (1972); 17 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure §

4226, at 551 (2d ed. 1995).[6]

## B.

Any court determining whether to issue an injunction must consider several factors that guide and constrain its

---

[6] Appellants raise the issue of Younger abstention, the prudential corollary to the Anti-Injunction Act's statutory circumscription of federal courts' ability to enjoin state court proceedings, see Younger v. Harris, 401 U.S. 37 (1971), but we need address it only briefly. Although Younger's application to civil proceedings between two private parties remains relatively unclear, a consistent prerequisite is that "an important state interest is implicated." See Anthony v. Council, 316 F.3d 412, 418 (3d Cir. 2003). We discern nothing about the state civil proceedings at issue here—personal injury suits sounding largely in state tort law—that can fairly be thought to implicate "important state interests." The instances where the Supreme Court and this Court have applied Younger to state civil proceedings—such as state contempt proceedings, Juidice v. Vail, 430 U.S. 327 (1977); judicial proceedings enforcing state court orders, Pennzoil Co. v. Texaco, Inc., 481 U.S. 1 (1987); and child support contempt proceedings, Anthony, 316 F.3d at 421—involved proceedings qualitatively different from those at issue here. This much was inherent in our decision in Prudential I and Prudential II, where we upheld orders enjoining state tort proceedings.

17

equitable authority. See Temple Univ. v. White, 941 F.2d 201, 214-15 (3d Cir. 1991); Shields v. Zuccarini, 254 F.3d 476, 482 (3d Cir. 2001). Of primary importance, a party seeking an injunction must show that there is some legal transgression that an injunction would remedy.[7]

In addition, any injunction a court issues must be commensurate with the wrong it is crafted to remedy—it is a "settled rule that in federal equity cases 'the nature of the violation determines the scope of the remedy.'" Rizzo, 423 U.S. at 378 (quoting Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 16 (1971)); see also Forschner Group, Inc. v. Arrow Trading Co., 124 F.3d 402, 406 (2d Cir. 1997) ("It is well-settled that the essence of equity jurisdiction has been the power to grant relief no broader than necessary to cure the effects of the harm caused by the violation"). As this Court stated in Temple Univ. v. White,

> While the scope of a district court's equitable powers to effect a remedy is broad, the relief which a district court may grant can be no broader than that necessary to correct the violation. Indeed, a federal court is required to tailor the scope

of its remedy in order to fit the nature of the violation which it has found.

941 F.2d at 215. The proper tailoring of injunctive relief is especially important when principles of federalism are involved. See Rizzo, 423 U.S. at 371 ("[A]ppropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief."). In other words, "federal courts should always seek to minimize interference with legitimate state activities in tailoring remedies." Stone v. City and County of San Francisco, 968 F.2d 850, 861 (9th Cir. 1992).

Here, the putative transgression that Wyeth sought to remedy through an injunction was appellants' violation of the settlement agreement. Thus, two interrelated considerations guide our review: (1) the proper construction of the settlement agreement's punitive damages provision; and (2) the scope of the District Court's injunctions. In other words, we must construe the settlement agreement and then determine the extent to which the District Court's injunctions prohibited actions that contravened the terms of the settlement. An over-inclusive injunction would run afoul of well-established principles of equity and federalism.

1.

The decision of a potential settlement class member to remain with the class or to opt out entirely at the threshold is a fateful one. The average class member has had no hand in

---

[7] Put differently, a party seeking a permanent injunction must "succeed on the merits." See, e.g., Temple Univ., 941 F.2d at 215.

18

negotiating the terms of the settlement. As demonstrated in <u>Prudential I</u>, the settlement's preclusive effect may be broad and strict. By waiving an initial opt-out, the class member surrenders what may be valuable rights, in return for countervailing benefits. In this case, important information for these potential class members included the availability, benefits, and disadvantage of the intermediate opt-out right.

This opt-out choice raises a significant issue of fairness. As in <u>Georgine v. Amchem Prods.</u>, the individual class members here have claims "that frequently receive huge awards in the tort system." 83 F.3d at 633. They can hardly knowingly waive some of their tort rights without a clear notice of what they are waiving. They may be entirely dependent on the class notice for this information. That is why we paid careful attention to the language of the class notice, which detailed the extent of the released claims, in upholding the injunction that enforced the preclusive provisions of the settlement in <u>Prudential I</u>. 261 F.3d at 366-67.

It follows that the preclusion language in the Diet Drugs class notice and settlement agreement must, in order to avoid due process concerns, be strictly construed against those who seek to restrict class members from pursuing individual claims. <u>Cf.</u> <u>United States v. Albertini</u>, 472 U.S. 675, 680 (1985) ("Statutes should be construed to avoid constitutional questions . . . ."). Here, the following language in the class notice

informed putative class members of the consequences if they signed onto the class and exercised intermediate opt-out rights:

> If you exercise the Intermediate Opt-Out right, you give up the right to receive further benefits under the Settlement Agreement, but you may choose to pursue in court any legal claims you may have against [Wyeth] relating to your use of Pondimin and/or Redux. However, *it is important to understand that if you exercise the Intermediate Opt-Out right, and choose to bring a lawsuit against [Wyeth], your lawsuit will be subject to certain restrictions including the following*:

> ! If you exercise your Intermediate Opt-Out right and choose to bring a lawsuit against [Wyeth], you may not seek punitive or multiple damages.

> ! If you exercise your Intermediate Opt-Out right and choose to bring a lawsuit against [Wyeth], you may only assert a legal claim based on the heart valve condition of the relevant Diet Drug Recipient that was [properly

19

diagnosed within a prescribed time period].

! If you exercise your Intermediate Opt-Out right and choose to bring a lawsuit against [Wyeth], both you and [Wyeth] will be subject to certain additional restrictions that are described in the Settlement Agreement. In order for [Wyeth] to be subject to these restrictions, such as waiver of any statute of limitations defense, you must bring your lawsuit, if you choose to do so, within one (1) year from the date on which you exercise your Intermediate Opt-Out right.

Wyeth Br., Ex. A at 12. The corresponding preclusive language in the settlement agreement regarding intermediate opt-outs appeared in three portions:

[1] [An intermediate opt-out] may pursue all of his or her Settled Claims (except for those claims set forth in subparagraphs (e) and (g) of Section I.53[8]), against

[Wyeth and other released parties], but may only assert a claim . . . based on the heart valve of the relevant Diet Drug Recipient which was diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram . . . .

[2] With respect to [any intermediate opt-out] who initiates a lawsuit against any of the Released Parties within one year from the date on which the Intermediate Opt-Out right is exercised, [Wyeth] shall not assert any defense based on any statute of limitations or repose, the doctrine of laches, any other defense predicated on the failure to timely pursue the claim, any defense based on "splitting"

unfair business practices, deceptive trade practices, Unfair and Deceptive Acts and Practices ("UDAP"), and other similar claims whether arising under statute, regulation, or judicial decision;

. . .

g. medical screening and monitoring, injunctive and declaratory relief[.]

Joint App. 572.

[8]Subparagraphs (e) and (g) of Section I.53 include, as part of the definition of "Settled Claims," all claims for damages or any other remedies for:

e. consumer fraud, refunds,

20

a cause of action, any defense based on any release signed pursuant to the Settlement Agreement, and/or any other defense based on the existence of the Settlement Agreement, except to the extent provided herein. [Intermediate opt-outs] may not seek punitive, exemplary, or any multiple damages against [Wyeth or other released parties] . . . .

[3] [Intermediate opt-outs] may not use any previous verdicts or judgments against [Wyeth], or factual findings necessary to such verdicts or judgments, for purposes of establishing claims or facts in order to obtain a verdict or judgment against [Wyeth] under the doctrines of res judicata, collateral estoppel or other doctrines of claim or issue preclusion. Nor may [intermediate opt-outs] seek to introduce into evidence against [Wyeth], for any purpose, such a verdict, judgment, or factual finding. Lawsuits initiated by [intermediate opt-outs] shall be subject to the provisions of Section VII.F.3.[9]

Joint App. 615-17.

Three restrictions emerge. First, the potential class members were told that intermediate opt-outs will be allowed to "pursue all . . . Settled Claims" for timely diagnosed VHD, except for those pertaining to consumer fraud or business

---

[9] Section VIII.F.3 provides:

The Parties to the Settlement . . . shall not seek to introduce and/or offer the terms of the Settlement Agreement, any statement, transaction or proceeding in connection with the negotiation, execution or implementation of this Settlement Agreement, any statements in the notice documents appended to this Settlement Agreement, stipulations, agreements, or admissions made or entered into in connection with the fairness hearing or any finding of fact or conclusion of law made by the Trial Court, or otherwise rely on the terms of this Settlement, in any judicial proceeding, except insofar as it is necessary to enforce the terms of the Settlement.

Joint App. 704.

21

loss. Specifically included are claims for such open-textured injuries as mental anguish, pain and suffering, and loss of consortium. Second, Wyeth agreed not to assert any defenses based on class members' failure to assert a timely claim and class members "may not seek punitive, exemplary, or any multiple damages." Finally, the provision addressed certain evidentiary restrictions: (1) intermediate opt-outs may not "seek to introduce into evidence" earlier verdicts or judgments against Wyeth, or the factual findings underlying them; and (2) neither party can offer evidence regarding the settlement agreement, including evidence regarding its negotiation or implementation.

The plain language is telling. The intermediate opt-out provision comprehensively promised that claims for a wide variety of losses can be sought, so long as they are for FDA-positive VHD. There is no limitation on VHD-related claims or causes of action. Moreover, there is no expression that opportunities to recover for mental anguish, pain, or loss of consortium will be impeded or hampered. If the drafters were concerned these type of recoveries might become vehicles for sub rosa punitive awards, they might have limited them; they did not.

Instead, the authors of the settlement specifically excluded only "punitive, multiple, and exemplary damages" from the laundry list of allowable recoveries. This reinforces the natural conclusion that claims for VHD were not restricted by the settlement, so long as forms of damages other than those

expressly forbidden were sought.

Significantly, evidentiary restrictions are explicitly addressed in the relevant provision of the agreement. The agreement forbids prior adverse findings or judgments against Wyeth from being placed in evidence for any purpose, as well as a wide range of evidence regarding the settlement agreement itself. This implies to the reader of the agreement that the drafters knew how to identify evidence restrictions when they wished to do so. There is no restriction, however, placed on the use of evidence simply because it would be relevant in supporting punitive damages. One deduces from the absence of such an evidentiary restriction that the agreement meant only to block the specified type of damages award and not types of evidence that are relevant to permissible awards but might also be relevant to punitive damages.

Appellees seek to rebut this language by referring to colloquy during the fairness proceedings that they claim further refines the meaning of the punitive damages preclusion. At an October 2002 status hearing, one negotiator stated his understanding that

> the essence of this bargain was that there would be no punitive damages in these downstream opt out cases and that does not simply mean no punitive damages. What [Wyeth] was bargaining for, clearly, they were saying . . . we were

willing to pay for what juries determine were caused by our diet drugs without reference to some additional element that is awarded by reference to fault evidence.

Joint App. 2149. This might be pertinent in construing the agreement as between parties who actually participated in the negotiations. See, e.g., Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 114 (3d Cir. 2001). But due process considerations counsel against binding absent potential class members to understandings that were not made express in the class notice or settlement agreement. And we are particularly wary of binding class members through statements made after the settlement was finalized and after they had to choose whether to opt out.

Appellees urge that our decision in Prudential I disposes of appellants' claims because they read that decision to hold that "when class members settle and release some of their claims—but preserve other claims from the settlement—that release bars the plaintiffs from offering evidence relating to the released claims in any subsequent trial of the preserved claims." Wyeth Br. 36. But we think that the settlement preclusion in Prudential I is different from this one, and different in a meaningful way.

The class notice in Prudential I informed class members that, in return for accepting settlements on some policy claims, they would release the defendants from any and all causes of actions, claims, damages, equitable, legal and administrative relief, interest, demands or rights, of any kind or nature whatsoever . . . that have been, could have been, may be or could be alleged or asserted now or in the future . . . on the basis of, connected with, arising out of, or related to, in whole or in part, the Released Transactions [i.e., settled policies under the settlement agreement].

261 F.3d at 367 (emphasis omitted). In other words, any *cause of action* or *claim* that was in any way related to a settled policy—even a claim that "could have been" raised on the basis of such a policy—was barred. This release language was indeed, as the class notice explicitly warned potential class members, "intended to be very broad." Id. at 366. And the District Court's injunction in that case tracked the language of the class notice, forbidding class members from bringing a lawsuit "based on or related to the facts and circumstances underlying the claims and causes of action" that were settled in the class action. Id. at 361. To block new claims "based on facts" underlying other settled claims is simply to effectuate the class notice language releasing claims that "could have been brought" based on the settled transactions. In other words, the release language in the Prudential

settlement was typical general release language that prevents new causes of action from overlapping with settled causes of action with a "common nucleus of operative facts." Id. at 367.

Contrast the language in the Diet Drugs release. The Diet Drugs release is not structured as a broad claims preclusion, but as a bar only to the magnitude and type of relief. The only *claims*-based limitations are that (1) the claims must be based on a timely diagnosed VHD injury, and (2) the claim may not be for consumer or business losses. VHD-based claims for compensation, including for pain, anguish, and loss of consortium, are not precluded or limited in any way. Indeed, the settlement agreement specifically contains Wyeth's renunciation of any defense based on "'splitting' a cause of action." What is limited is the type and extent of *damages* for such VHD-claims.

If we were to accept Wyeth's invitation to read this damages limitation as if it were a broad Prudential-type release of all claims that could be the basis for a punitive damages award, we would face an anomaly. Since the predicate to any punitive or multiple damages award is a finding of tortious liability, Wyeth's logic would foreclose opt-out plaintiffs from proving liability at all. That interpretation would make the settlement agreement internally contradictory.

Of course, Wyeth does not press so absurd a contention. But, in effect, Wyeth wants us to read this punitive damages

limitation as if it were a limit on the manner in which opt-out plaintiffs can pursue their claims for compensation. Under this view, a plaintiff may show unreasonable behavior to recover compensation for negligence, unless the behavior was really unreasonable (so that it might support punitive damages). Put another way, Wyeth urges that very strong evidence of fault must be diluted so that it would not arouse the jury to award punitive damages, if punitive damages could be awarded—which they cannot be. In the absence of an explicit description of this novel type of restriction in the settlement agreement, we decline to construe the agreement to imply an evidence-dilution requirement for compensation claims that are clearly preserved for the opt-out plaintiffs.

2.

All of this is not to say that the District Court was powerless to restrain opt-out plaintiffs from evading the prohibition against exemplary damages. Even under a strict construction of the settlement agreement, the District Court was entitled to prevent circumvention of the damages limitation. The District Court acted consistently with the settlement agreement, for example, when it enjoined the introduction of certain types of evidence relevant only to the impermissible purpose of obtaining punitive damages. Appellants conceded this at oral argument. Tr. 9. So, as appellants acknowledged, the District Court correctly banned evidence relating to Wyeth's size, profits, and sales figures,

which is not probative of liability, causation, or compensation. Id. at 10, 13.

But PTO 2828 swept far more broadly, prohibiting Clark from offering evidence that was relevant—indeed, highly probative—on issues of negligence and failure to warn.[10] The District Court reasoned that such evidence, if suggestive as well of intentional misconduct, fell within the punitive damages bar because it could support a punitive verdict or because it could inflame the state jury. The test that the District Court seemed to employ was to place "off-limits" evidence that was not "necessary" to prove a claim to compensation. PTO 2828, at 8. Excluded under this approach were pieces of evidence that "suggest malfeasance on the part of the company that goes beyond mere negligence," id. at 27, or that "connotes more than negligence." Id. at 32.

Intentional or reckless behavior may be highly probative of elements of negligence or defective design cases. The failure to report adverse actions to the F D A — w h e t h e r   a c c i d e n t a l   o r

intentional—would be probative of a failure to warn. And intentional or reckless behavior is often relevant to showing conduct below the reasonable standard of care necessary to make out a case of negligence.[11]

_____

[10] We center our discussion on PTO 2828 because it was the most comprehensive of the District Court's orders and appears to have established a baseline set of guidelines for all intermediate opt-outs litigating their claims in state courts, regardless of whether they were parties to PTO 2828. Counsel for Eichmiller et al., for example, agreed to comply with PTO 2828 even though it did not specifically bind them.

_____

[11] Certain categories of intentional conduct—specifically, intentionally tortious conduct—do not support a claim of negligence in certain jurisdictions. Compare Dairy Road Partners v. Island Ins. Co., 992 P.2d 93, 114-15 (Haw. 2000), Ins. Co. of N. Am. v. Miller, 765 A.2d 587, 601 (Md. 2001), and Jamison v. Encarnacion, 281 U.S. 635, 641 (1930) with Landry v. Leonard N. East Ins. Co., 720 A.2d 907, 910 (Me. 1998), Am. Nat'l Fire Ins. Co. v. Schuss, 607 A.2d 418, 423 (Conn. 1992), and Walters v. Blackshear, 591 N.E.2d 184, 185 (Mass. 1992). The distinguishing factor between intentionally and negligently tortious conduct is that an intentional tortfeasor intends to bring about the harm that results from his actions. See Schuss, 607 A.2d at 423. Thus even in those jurisdictions where negligence and intentional torts are mutually exclusive, intentional conduct may be relevant to negligence so long as it does not involve intent to bring about the harmful result. See Landry, 720 A.2d at 910; Fowler V. Harper et al., The Law of Torts § 16.9 n.2 ("An intentional act may be negligent.") (citing Dartez v. Gadbois, 541 S.W.2d 502 (Tex. Civ. App. 1976)); see also Ghassemieh v. Schafer, 447 A.2d 84, 89-90 (Md. Ct. Spec. App. 1982) ("We see no reason why an intentional act

A few examples suffice to illustrate

that produces unintended consequences cannot be a foundation for a negligence action."); see also 57A Am. Jur. 2d Negligence § 30 (2004). As one major treatise explains:

> [I]ntentional conduct and even intentional risk-taking is analyzed under negligence rules unless the defendant has a purpose to invade the plaintiff's interests or a certainty that such an invasion will occur. . . . The defendant who intentionally takes a risk may or may not be negligent; negligence will depend upon the seriousness of the risk and the reasons for taking it.
> . . . .
> In spite of the fact that it is conduct and risk, not mental state that determines negligence, the defendant's state of mind is not necessarily irrelevant in a negligence case. The defendant's knowledge of facts that make a given act risky (as distinct from his attitude) is frequently important on the negligence issue.

Dan B. Dobbs, The Law of Torts § 116 (2001).

the problem. The District Court correctly recognized that the use and content of a "black box" on the drug warning label "goes to the issue of failure to warn." Id. at 8. Accordingly, it authorized Clark to seek to prove that warnings were "inadequate or wrong and that certain relevant information was not reported or not reported on a timely basis to the FDA." Id. at 9. But the Court held that to avoid "implicat[ing]" punitive damages, Clark could not prove that any such failure was intentional. As a consequence, the District Court struck deposition testimony from Wyeth's Associate Director of Safety Surveillance specifically admitting that valvular heart disease reactions to the drugs were not reported to the FDA. Id. at 33. The District Court also banned testimony from other witnesses that they fought strenuously against any "black box" warning. PTO 2828, at 31. This evidence certainly tended to prove that the defendant "knows or should know of a potential risk of harm presented by a product but markets it without adequately warning of the danger," which is the definition of a "marketing defect" under Texas tort law. See Sims v. Washex Mach. Corp., 932 S.W.2d 559, 562 (Tex. Ct. App. 1995); see also Jackson v. Johns-Manville Sales Corp., 750 F.2d 1314, 1318-20 & n.8 (5th Cir. 1985) (en banc) (Mississippi law). But under PTO 2828, this evidence was placed out of bounds.

Similarly, the District Court placed off-limits any evidence that mentioned medical side-effects other than VHD

26

itself.[12] This evidence was not offered to support claims for these side-effects, since plaintiffs did not suffer from them. Rather, they were offered for other purposes, such as to prove duty to warn. Evidence of the totality of the risks of injury may be admissible under state law to show the scope of the duty to warn, even if the individual plaintiff has not sustained all the injuries in question. See Dartez v. Fibreboard Corp., 765 F.2d 456, 468 (5th Cir. 1985). Nevertheless, the District Court ruled out testimony about delays in changing warning labels on Pondimin if the warnings concerned PPH. The Court justified this ruling on the ground that plaintiffs did not have these side-effects, so that this evidence would "have the effect of unfairly arousing the jury against Wyeth." PTO 2828, at 7.

The District Court also categorically prohibited plaintiffs from offering evidence of "Wyeth's marketing or promotion of diet drugs to the extent that Wyeth placed marketing or promotion ahead of health or safety concerns." Id. at 6. The Court took this step on the grounds that "such evidence and argument can

have no other purpose than to obtain punitive damages." Id. at 20. Evidence tending simply to show that Wyeth wanted to successfully market the diet drugs and make a profit selling them would not be relevant to show, for example, that Wyeth acted negligently. But excessive concern with the image and marketing of the diet drugs at the expense of making efforts toward determining whether they were safe could be probative as to whether Wyeth breached a duty of care towards the plaintiffs.

In effect, the District Court trimmed evidence that was probative, but that it viewed as unnecessary and so inculpatory that it might inflame the jury to award damages that would punish Wyeth instead of simply compensating the plaintiffs. The District Judge effectively adopted the role of a trial judge balancing probative value against unfair prejudice. Cf. Fed. R. Evid. 403. By doing that, he moved beyond mere enforcement of the damages restriction, and affected plaintiff's right to try her permissible liability case.

A trial is more than a matter of presenting a series of individual fact questions in arid fashion to a jury. The jury properly weighs fact questions in the context of a coherent picture of the way the world works. A verdict is not merely the sum of individual findings, but the assembly of those findings into that picture of the truth. As the Supreme Court instructed in Old Chief v. United States, evidence "has force beyond any linear scheme of reasoning, and as its pieces come together a narrative gains

_____

[12] This ruling was not based on claim preclusion. Intermediate opt-outs were limited to recovery for VHD but were not barred from recovery for PPH, a side-effect that is distinct from VHD. See Joint App. 572-73, 616; PTO 1415, at 70; In re Diet Drugs, No. 99-20953, Memorandum and Pretrial Order No. 3065, at 5 (E.D. Pa. filed October 10, 2003).

27

momentum, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict." 519 U.S. 172, 187 (1997). Unduly sterilizing a party's trial presentation can unfairly hamper her ability to shape a compelling and coherent exposition of the facts.

Of course, at trial this process of evidentiary balancing is nuanced and contextual. For that reason, "excluding evidence under Fed R. Evid. 403 at the pretrial stage is an extreme measure." Hines v. Consolidated Rail Corp., 926 F.2d 262, 274 (3d Cir. 1991). In In re Paoli R.R. Yard PCB Litigation, we explained:

> [A] court cannot fairly ascertain the potential relevance of evidence for Rule 403 purposes until it has a full record relevant to the putatively objectionable evidence. We believe that Rule 403 is a trial- oriented rule. Precipitous Rule 403 determinations, before the challenging party has had an opportunity to develop the record, are therefore unfair and improper.

916 F.2d 829, 859 (3d Cir. 1990) (internal citation omitted). In short, the District Court's broad order prematurely struck the balance between probativeness and prejudice, and did so for trial proceedings yet to occur in another court system before a different judge.

Appellees argue that Clark has no cause to complain about losing access to some evidence relevant to liability because she was offered, and declined, Wyeth's stipulation not to contest the element of breach of duty. Wyeth Br. 46. Notably, Wyeth did not offer to concede negligence or defective warning before the jury. It proposed, instead, a stipulation, in the form of a conditional double negative, that would present two specific interrogatories to the jury—cause in fact and damages. Joint App. 3371-72.

This parsimonious—indeed, illusory—offer was understandably rejected by Clark's counsel. As State District Judge Powell found, it simply misconceived Texas tort law, and would have created confusion for the jury. But beyond that, restricting plaintiff to a sterile concession and the right to litigate two particularized questions would seriously disadvantage her at trial (as skilled counsel for Wyeth surely recognized). Jurors might well wonder at the fairness of determining causation and damages in a vacuum devoid of any suggestion of liability or negligence. Intermediate opt out plaintiffs never agreed to relinquish their right to try their allowed claims effectively in state court.

Moreover, removing critical issues of fact from the jury without an adequate explanation runs the risk of distorting jury deliberations. The absence of proof that would normally be expected can cause the jury to draw unwarranted inferences.

28

"[T]here lies the need for evidence in all its particularity to satisfy the jurors' expectations about what proper proof should be." Old Chief, 519 U.S. at 188. For this reason, unless a stipulation adequately concedes an element of proof, it can prejudice the party carrying the burden of proof. In this case, the proposed concession by Wyeth would, as Judge Powell saw, "raise a substantial possibility that one or more jurors would be influenced by the lack of evidence and the lack of explanation." Joint App. 1290.

Insofar as the injunctions barred the use of evidence that was relevant to genuine issues in the state trial—apart from punitive, multiple, or exemplary damages—they placed restrictions on opt-out plaintiffs that went beyond the fair terms of the settlement agreement.

3.

Finally, we note that injunctions must be enforceable, workable, and capable of court supervision. See Lemon v. Kurtzman, 411 U.S. 192, 200 (1973) ("[E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable."); United States v. Paramount Pictures, Inc., 334 U.S. 131, 161-66 (1948) (vacating injunction that implicated the "judiciary heavily in the details of business management" in order for supervision "to be effective"); Rutland Marble Co. v. Ripley, 77 U.S. 339, 358-59 (1870) ("It is manifest that the court cannot superintend the execution of such a decree. It is quite impracticable."); Restatement (Second) of Torts § 943 cmt. a ("In determining the appropriateness of injunctive relief, the court must give consideration to the practicality of drafting and enforcing the order or judgment. If drafting and enforcing are found to be impracticable, the injunction should not be granted."). The District Court's orders raise practical and institutional concerns in this regard.

PTO 2828, as we have seen, is not limited to protecting the core of the settlement's damages limitation by forbidding plaintiffs from seeking such damages in their pleadings or presenting evidence relevant only to such damages. Rather, the order enforces a series of prophylactic prohibitions that affect plaintiffs' ability to obtain permissible compensatory damages. As written, PTO 2828—which is enforceable, of course, by the sanction of contempt—would make it very difficult for plaintiff to try the case that is preserved to her under the settlement agreement.

Numerous exhibits and portions of testimony are excluded definitively, regardless of the purpose for which they are offered. By way of example, the District Court nixed deposition testimony about efforts by Wyeth employees to avoid a "black box" warning. It is not clear what recourse a plaintiff would have if, during the course of trial, a Wyeth employee were to assert that Wyeth was always scrupulous and forthcoming on warning issues. By its terms, the order would appear to forbid plaintiff from offering the deposition testimony for purposes of rebuttal or impeachment. Nor, on the face of the order, would plaintiff be justified in

29

introducing evidence of failure to warn regarding PPH on the ground that it negates the trial testimony that Wyeth is always forthcoming. Normally, a trial judge might well conclude such testimony opened the door for previously out-of-bounds evidence. PTO 2828 does not vest the state judge with that discretion. Presumably, the parties—and the state court—would have to contact the District Court and seek a modification of PTO 2828.

Even more awkward is the broadly framed prohibition against offering evidence "related directly or indirectly" to such topics as wanton or similar conduct by Wyeth, or Wyeth's marketing of diet drugs "to the extent Wyeth placed marketing or promotion ahead of health or safety concerns." Almost any proof related to negligence can be regarded as "related indirectly" to wanton conduct. Hypothetically, imagine that Clark calls a witness who will testify that Wyeth officials were made aware of VHD dangers and reached a decision that no warning should be published. PTO 2828 could be read to preclude this evidence because it is "indirectly related" to "wanton or similar conduct." Of course, the evidence is also highly probative of negligence.

Another hypothetical: Suppose Wyeth calls a witness who testifies that decisions about warnings are made only after careful evaluation of scientific evidence. Would PTO 2828 allow Clark's attorney to cross-examine on (still hypothetical) instances where marketing considerations were discussed in meetings about warnings?

Again, in the usual case counsel faced with such a question would ask the trial judge for guidance either by way of motion or sidebar. But PTO 2828 would make those questions fodder for the District Court, without a full appreciation of the flow of the testimony. Counsel might have to seek, for example, telephonic sidebars with the District Court. The order creates a highly intrusive and unworkable regulatory scheme.

Moreover, we emphasize, the rules imposed by PTO 2828 are not merely enforceable by the usual mechanism of the trial court's sustaining objections or, perhaps, granting a mistrial. Here, a violation of the rule—a wrong guess—could result in a punitive sanction. There will be strong pressure on counsel to steer well clear of the line and possibly forego offering admissible evidence that Clark would normally expect to get before the jury.

This order is even more problematic insofar as it bans counsel from making argument "to the court" regarding these topics. Read literally (as counsel must), this would prevent Clark from even arguing to the state judge, outside the presence of the jury, that certain evidence falls within or outside the scope of PTO 2828. We do not think the District Court actually meant to preclude such argument. Indeed, it is hard to see what purpose would be served—and easy to see the problems that would arise—in restraining

counsel from making arguments in state court. The point is that the District Court's understandable effort to lock the door against impermissible attempts to obtain exemplary damages led to an order that seriously interferes with Clark's rights to try her case.

Implicit in our discussion as well is the fact that PTO 2828 disrupts the state court's ability to manage its own judicial process. As the previous illustrations suggest, PTO 2828 would remove from the state judge a whole panoply of decisions that he or she would normally be authorized—indeed obliged—to make. But the process the order leaves is unclear. Some of the exclusions in the order are left to be applied by the state judge. Others are not. It is not clear, for example, whether the state judge would determine whether evidence is "related indirectly" to forbidden topics.

As we have held, the District Court had the unquestioned right to effectuate the restraints of the settlement through an order limiting opt-out plaintiffs' conduct in ancillary state proceedings. But we believe that that power must be exercised in a manner that minimizes entanglement in the state judge's ability to supervise judicial proceedings in his own courtroom. Similarly, the order should be fashioned in a manner that presumes that the state judge is capable and willing to enforce that settlement without close and intrusive supervision by the District Court.

III.

The settlement approved and supervised by the District Court in this case is a landmark effort to reconcile the rights of millions of individual plaintiffs with the efficiencies and fairness of a class-based settlement. Critical to this effort was the allowance of downstream opt-outs, so that potential class members were not faced with an all-or-nothing decision at the threshold. To make this allowance meaningful, the settlement had to protect Wyeth against its largest fear, potentially ruinous punitive damage awards. At the same time, it had to allow intermediate opt-out plaintiffs to have a fair chance to litigate their claims and obtain those damages that were expressly preserved.

The District Court had, and still has, the power to effectuate and protect the terms of this bargain. But in doing so, the Court must be mindful of two limiting considerations: (1) opt-outs must be able to fairly litigate the claims preserved to them under the agreement, and (2) intrusion into state court proceedings should be minimized.

Accordingly, the District Court erred in imposing the evidentiary restrictions of PTO 2828 because those restrictions were overbroad and impinged on plaintiffs' rights under the settlement, and they unduly entangled the Court in the management of separate state court proceedings. PTO 2828's pre-trial evidentiary restrictions survive these limiting principles only insofar as they prohibit opt-outs from offering evidence that is relevant *exclusively* to forbidden damages. See PTO 2828, ¶¶ (3)(a)-(b). As

31

appellants themselves concede, an injunction to that effect is entirely permissible.

Specifically, the following portions of PTO 2828 must be vacated: (i) the categorical evidentiary restrictions in Subsections (2)(b)-(c) and Subsections (3)(c)-(h), insofar as they preclude plaintiffs from introducing evidence relevant to proving their VHD claims in state court; and (ii) the limitations on exhibits and deposition testimony in Section (4), insofar as they preclude plaintiffs from introducing evidence relevant to proving their claims in state court. PTO 2828 is consistent with this opinion insofar as it prohibits plaintiffs from "introducing any evidence" relevant exclusively to "punitive, exemplary or multiple damages, however described," which specifically includes evidence of "(a) Wyeth's profits, size or financial condition"; and "(b) the amount or size of Wyeth's sales of diet drugs or other products."

PTO 2828 also runs afoul of this opinion insofar as it prohibits the parties from "making any statement or argument to the court." But the order is consistent with this opinion insofar as it prohibits the parties from "making any statement or argument to the . . . jury related directly" to evidence relevant only to punitive damages.[13]

We note that although we have limited the District Court's ability to prohibit the parties from offering certain evidence in their state court trials, the state courts are presumably mindful of the obligation to honor the settlement agreement, and to ensure that the parties do not evade it. That will undoubtedly impel the state courts during trial to exclude evidence when its prejudicial effect (namely its tendency to inflame the jury and improperly inflate compensatory damages) outweighs its probative value. We are confident, particularly in light of the previous state court orders in the record, that the state courts can and will capably manage this task.

In addition, our opinion leaves the District Court free to consider other measures, aside from imposing evidentiary restraints, that will effectuate the limitations of the settlement agreement. The District Court might consider, for example, ordering language to be included in a stipulation or proposed jury instruction that would make it clear to the jury that exemplary damages may not be awarded. Or, the Court could direct the parties to agree to a bifurcated trial—where damages are determined apart from liability—in the event that the state court were to deem it advisable.

Moreover, while we understand the desirability of taking steps to protect the settlement agreement before a trial occurs,

---

[13] Although we specifically address PTO 2828, the most comprehensive order, we expect that the District Court will modify all orders at issue in this appeal so that they are consistent with this opinion.

the District Court is not without recourse in the event that a verdict is rendered that appears to grant punitive damages under the guise of some other damage category. The precise circumstances that might arise are too speculative to discuss with specificity. But post-trial remedies should not be categorically rejected.[14]

We recognize that the District Court's task is a difficult one, particularly in light of the patent efforts by plaintiffs' counsel to press against the damages

restrictions to which intermediate opt-outs are bound. But the Court's power has to be exercised consistent with the terms of the notice and agreement on which potential class members relied at the outset of the process. Moreover, it has to be applied to the state courts with appropriate consideration for limitations of equity, federalism, and comity.

Accordingly, we will vacate the Court's injunctions and remand with instructions to modify them in accordance with this opinion.

---

[14] At oral argument, we raised the question whether the District Court had power after a verdict to limit or remit a damage award that seemed so excessive that it amounted to exemplary damages. We particularly focused on the Rooker-Feldman doctrine. This decision is not the proper place to consider fully the extent to which the Rooker-Feldman doctrine might circumscribe the District Court's ability to effectuate the agreement's punitive damages provision after a jury has awarded a plaintiff damages. We note, however, that where "a federal court's proper exercise of its jurisdiction to manage its cases has the secondary effect of voiding a state court determination, it is not a review of that order for purposes of the Rooker-Feldman doctrine." Diet Drugs I, 282 F.3d at 242. On the other hand, the Full Faith and Credit Act, 28 U.S.C. § 1738, precludes a federal court from reconsidering a state court's judgment as to the preclusive effect of a federal court judgment. See Parsons Steel, Inc. v. First Ala. Bank, 474 U.S. 518 (1986).